May it please the court, good morning. Stephanie Borchers on behalf of non-party petitioner Ryan Uehling. I am ambitiously hopeful to reserve two minutes for rebuttal. Just watch the clock. Thank you, your honor. This case presents issues, both big picture issues and obviously what I'll call little picture issues. But in the context of all of that, I think it's critical in every case, of course, but especially in this one, to remember the procedural context that we come to this court and to view all of the issues in light of the fact that my client is a non-party to an employment lawsuit that's going on in Arizona. He was subpoenaed to testify as a witness in Fresno by the Employment Law Council out of Arizona. And when he appeared for his deposition, he was asked numerous questions by the defendant in the employment lawsuits, false claims act lawyer, who came from Boston to depose him. It went on a motion to compel. The answer to, I believe, was 134 questions. It came down to 64 after a meet and confer. And the magistrate judge determined that there was not either a statutory privilege, we'll call it that, to protect some of these questions, nor an attorney-client privilege because of the crime fraud exception. Counsel, I think we're aware of the facts. Is this, is mandamus the proper remedy in this situation? Yes, Your Honor. We believe mandamus is the proper remedy because But you can only get it if you can establish clear error. Isn't that correct? Yes. And the typical approach in this kind of situation, as I understand it, is to seek review of the district court's order through an appeal from a contempt order. Why shouldn't we follow that policy? You are correct, Your Honor. This circuit has held, as we acknowledged forthrightly in our briefs, that generally, third parties can be required to go through contempt before they have an appeal available to them. I would submit there's at least two reasons why that's not an appropriate remedy here. One, again, it goes back to the procedural context, which is the elephant in the room, so to speak, of this qui tam action that is supposedly pending, which has placed a non-party to an employment lawsuit in a deposition proceeding where he's trying to protect his attorney-client privilege. And if he's forced to go to contempt first and then on appeal, he's placed in a situation where he has no control over any of the proceedings that will ultimately lead to his appeal other than contempt. So while there are cases that have held that third parties are required to be in contempt, there are also cases cited in our brief where a third party is not necessarily required to be to, excuse me, submit themselves to contempt before they're able to have an appeal. It is an extraordinary remedy. But usually they have to submit to the contempt. Isn't that the general rule? Yes, sir. So what is so different about this case? What makes this so significant? There are a few things here that make this case significant. One, I believe, is that the contempt proceedings that Mr. Ewing would be subjected to could be difficult in the Eastern District of California, which was where we originally brought the emergency stay motion, in part because of, I believe, they're up to 1,800 cases per district court judge. And the contempt would have to go through the district court judge, not a magistrate. So the remedy could be extremely delayed in the Eastern District. Can we take that into account? I believe you can, Your Honor. I believe that we have Article III judges who have a constitutional duty to exercise what they constitutionally are required to do, and that our client needs a remedy. He has to be afforded a remedy. And what's happened here is there's been a stay in place as to just these five questions. Again, it's not all of the deposition questions. Those five questions now have been fully briefed. And so we're in a situation where I believe this Court, if for no other reason, should exercise its equitable powers to rule on the issue. Because it's been fully briefed, we're here before the court. So you're saying there should be a different ruling depending on the caseload of the district court? No, Your Honor. I would not – I would not submit that there's a different rule depending on the caseload of the court. I do believe, however, that there are circumstances where a third party is simply not reasonable to require that third party to submit to contempt, and that's simply one of those circumstances here. Another circumstance has to do with the fact that he is only a witness in a different jurisdiction than the employment lawsuit that's going on in Arizona. So now he's been a third party whose interest in the Arizona lawsuit is so tangential to what's actually occurred. So he's being requested to appear to a deposition, hire a lawyer to do that, submit himself to contempt proceedings. And again, he's simply a witness to third party proceedings going on in Arizona. And I do not believe that under the circumstances, the types of cases that say that a third party – where a third party has been held to have to submit to contempt. For example, one, I believe, was an accountant who was representing the interests of the defendant at the time. And so the court determined – and again, I don't have the case site right in front of me – but the court did determine that that accountant should be required to wait for contempt because he had an interest in the proceeding. Counsel, getting to the specific questions, 2, 3, and 19, I kind of linked together and wonder whether they really aren't covered by the crime-fraud exception. Thank you, Your Honor, and I agree, 2, 3, and 19 are the central focus of the crime-fraud exception issue. The crime-fraud exception, whether you apply California law or the Federal standard and they are different, under California law, there must be a reasonable inference. And I think – is your question asking me to apply it here, with these three questions? I guess I'm asking why isn't – your argument is that these are protected by the attorney-client privilege. Correct. And my question is why aren't they subject to the crime-fraud exception to the attorney-client privilege? There's no evidence in this record, Your Honor, that a crime or even a reasonable inference of a crime has been committed. The evidence that was in front of the district court was that Mr. Ewing was an employee who came into authorized access of certain documents in the course of his employment. His employment was terminated and he maintained access to those documents. Under NOSOL, whether you look at authorized access or access to documents, in this case, because he had authorized access under the terms and conditions of his employment, the laptop, whether it's under the Computer Fraud and Abuse Act or you look at it under the Economic Espionage Act with respect to trade secrets, the laptop is really a digital file cabinet. There's not a crime committed by accessing documents that you obtained through the normal course of your employment. But there's an allegation that he shared these documents with his others and that that may be potential, I guess, crime. Correct, Your Honor. And that raises two points in my mind. The first is, could it be a crime under any circumstances given the context in which he obtained the documents? And we submit that it's not. But even if it were, there's a public policy exception, certainly with respect to the Economic Espionage Act, where if an employee has documents that he or she submits show evidence of a fraud against the government and turns those documents over to the government, to say that a crime has been committed by doing so would necessarily require a finding, essentially, that a defendant's trade secrets – excuse me, that a defendant's method in which they're committing a fraud is a fraud. If – go ahead, Your Honor. Well, it's just a prima facie case that has to be showed by – isn't that right? Correct. And you're saying the prima facie case has not been shown? Absolutely not. There has not been a prima facie case here, either, again, under the California standard, which is reasonable inference, or certainly not the Federal standard, which is the preponderance of the evidence. And again, what – But our review is, I guess, for clear error, correct? Correct. Of the district court's decision. Correct. It seems to me you're arguing something else, some additional twist to this, that because this crime fraud exception and because your client's in this unique position of being, you know, a realtor in a KETAM action, that that's, like, doubly problematic. Yes, Your Honor. Okay. And I guess my question for you is, can you point to any basis in law for the KETAM suit that your client's role in a KETAM suit would, under the False Claims Act, shield somebody from liability for conduct that might otherwise be criminal? No, Your Honor. There's not a case that's held it in the criminal context that there is – and I'll refer to it as a public policy exception. This Court declined to expressly rule on that issue with respect to confidentiality agreements and the shielding of a civil suit against a defendant in the CAFASO matter, and we've acknowledged that in the briefs. And as far as I'm aware, there is not a court that has addressed the issue of a public policy exception with respect to crimes. Now, again, here it's alleged crimes. We're three steps removed from the idea that he's being charged with a crime. We are in the stage of a third party sitting as a witness in an employment lawsuit with respect to False Claims Act questions being asked. So I think it's a little bit even more attenuated. Now, with respect to confidentiality agreements, as we cited, I believe it's on pages 22 and 23 of our opening brief, there are at least three, and I believe more since then, district courts that have held that there is, in fact, a public policy exception with respect to document retention by employees in the Keytown context. And I would submit that that is exactly what has happened here. And while it's being labeled a crime, really what it is is an allegation of a breach of a company policy, a breach of a confidentiality agreement that is being framed as a crime for purposes of piercing the attorney-client privilege. And I believe that to be absolutely improper, certainly because the attorney-client privilege is such an inviolate rule that we really have to protect. And here, when what we have is a breach of a company policy, that's the most that can be shown, and again, I don't believe that's even on this record. Counsel, with respect to 54 and 72, where is the attorney-client privilege? Your Honor, we would submit, we would be willing to waive the issue as to 54 and 72 at this point. So you're relying on 2, 3, and 19? Yes, Your Honor. In the 72 hours that the writ was drafted, we were over-inclusive. Anything further at the moment? No, Your Honor. Very well. You can reserve your time. Thank you. We'll hear from the other side. Thank you, Your Honor. May it please the Court. My name is Mike Clowkes. I'm here on behalf of Millennium Laboratories. I think it's important to focus on what this really is. This really is, at heart, a routine discovery order concerning five questions asked at a deposition, where, after extensive briefing, the magistrate judge ruled that a crime fraud exception applied and issued a 23-page opinion on that, and then the district court judge, after extensive briefing and a motion for reconsideration, issued an 11-page opinion on that. This is not a case presenting a novel question of law. This is not a case presenting a situation where a district court has made repeated errors. This is not a situation where the non-party witness doesn't have an adequate remedy. The non-party witness could, as the courts have or the Court has suggested, refuse to answer the question, had a contempt hearing, brief these issues then, and if you had been found in contempt, then could have appealed it to this Court. This is also not a situation that's used to be used as an excuse to say, you know, this is just ordinary. This doesn't seem ordinary to me. This seems highly aggressive, and I guess it's not wrong to be aggressive, but, I mean, is this the typical strategy for a False Claims Act specialist to be called on to litigate employment-related matters? I mean, is that, maybe that's just, maybe it's more from Boston, the common practice. I don't know. So I guess I would say this, Your Honor. The particular background of the lawyer asking the questions is not relevant to the issue at hand. Certainly, I do have an expertise in a particular area of the law, but this is not relevant to the issue at hand. And I don't think that the particular individual, Mr. Euling, had been identified as a witness in an employment litigation by an ex-employee of Millium Laboratories. I understand, because this is under a writ of mandamus, so the burden for the plaintiff here is very high, or the pellet is very high, but it just doesn't seem ordinary. You just said this is a routine discovery dispute. It doesn't seem like a routine discovery dispute. If I can address that, Your Honor, I would say this. When Kelly Nelson, the plaintiff, identified Mr. Euling as one of her witnesses, the company identified that his laptop was still sitting on a shelf. The laptop was then opened and examined and sent off to a forensic examiner who identified that there had been numerous deletions from the laptop, that there had been cloning software put on the laptop, that the laptop had had contact with a brother printer, that the laptop had been to the Sacramento airport after Mr. Euling's termination from Millium, and that there was a deleted electronic reference to an electronic plane ticket to go to a firm in Houston after his termination. There was also evidence on the laptop that the laptop was used after he was fired to access the company's mainframe computer in San Diego. None of that is within the authority. And that's what triggered, at the same time that this is going on, Millium is involved in federal litigation with one of its main competitors in federal court in Florida. And Millium is also under federal criminal investigation in the District of Massachusetts. So Millium has a lot of issues at play. And there are some additional facts that go squarely to your question, but they're not in the record. Happy to address those and raise those, but I just want to point out that they're not in the record. That we have since discovered, since the record in this case was created, that Kelly Nelson's counsel's legal fees have been paid for by Ameritox, the competitor that's suing Millium in federal court in Florida. And is that in the record? That's not in the record. But what is in the record is that Mr. Euling, the non-party witness, had a meeting with the Ameritox counsel in his law firm's offices in Houston after he was terminated from Millium.  And he had a number of questions that he refused to answer during his deposition. And those questions were part of the focus of Judge McAuliffe's order and Judge O'Neill's order. So this is not normal, routine, small litigation dispute. But the issue before the court is I submit a routine discovery order involving the application of the crime fraud exception to three questions at this point. What about counsel's argument about the conditions at the Eastern District, each judge having 1,800 cases in his backlog? What's the relevance of that from your point of view? See, Your Honor, I don't see a relevance at all. I think that's a true fact. I don't question Judge O'Neill putting that in his order. But it didn't have any impact here. When we appeared before Judge McAuliffe, she gave us a full hour to argue the 61 questions that we moved on and whether or not the crime fraud exception applied. And most of that argument was on the crime fraud exception, a full hour. She wrote a lengthy opinion on it. Judge O'Neill addressed it promptly. Mr. Ewing's counsel made an argument to this court that there wasn't time in the district court to get a contempt ruling. In fact, Judge O'Neill ruled pretty fast. He also wrote a multiple page opinion. The court addressed it quickly, carefully, I would say very confidently. Your Honor, if, I mean, it's really hard to look upon what the court did below and say they gave short shrift to any of the legal arguments that were made to them. They were careful. Both judges were careful. They evaluated the issues. They listened to all the arguments. What we have, in fact, is a series of arguments that are made here today that were never actually presented to the district court, to either Judge McAuliffe or to Judge O'Neill. A couple of the questions, the attorney-client privilege was not preserved during the deposition. That's question number three at this point. We have two, three, and 19 left.  Your Honor, I would like to quote Justice Sotomayor, who I believe stated it quite well. For many parties to undertake successive piecemeal appeals of all adverse attorney-client rulings would unduly delay the resolution of district court litigation and needlessly burden the courts of appeals. Mr. Ewing had a very appropriate, adequate remedy here. He could have refused to answer the questions. At that point, that would have triggered a decision-making on Millennium's part, do we move to compel or not? Do we move for a finding of contempt or not? And there would have been a hearing. And the judge might have ruled in Millennium's favor. The judge might not have ruled in Millennium's favor. The issue might not even be here, but for this refusal to answer the questions and this request for an extraordinary remedy, the remedy of mandamus. I think if the court grants mandamus in this instance, there will be many of these. All right. Thank you, counsel. Anything further? Nothing further. Mr. Borchers, you have some reserve time. Thank you, Your Honors. I certainly don't mean to imply that either Judge McAuliffe or Judge O'Neill gave short shrift to any of this. For purposes of us being here today, however, we do have fully briefed in front of this court the issue on the crime fraud exception with respect to the now three questions. I would submit that sending this back or forcing Mr. Ryan or, excuse me, Mr. Euling to sit through a deposition, refuse to answer these questions, and then go through contempt proceeding would be a monumental waste of judicial resources. Do you disagree about the question not being preserved? I absolutely disagree. As we briefed, Your Honor, the reality is, is that Mr. Euling showed up to give his testimony as a witness in the Kelly-Nelson employment case and was clearly blindsided by Mr. Lauz's appearance. I think the record makes clear Mr. Lauz was admitted pro hoc vicee the very same day that he appeared at the deposition of Mr. Euling. So Mr. Euling had no idea what he was walking into. And his counsel made numerous objections throughout the record. It was patently clear to everybody there that he was preserving every objection that he can. And our citations in the brief do show that courts have acknowledged that it would be a miscarriage of justice to find a waiver when, you know, three questions before he had asserted the attorney-client privilege and four questions after he also asserted the attorney-client privilege. And everybody in the room was well aware he was attempting to protect those rights. So as to, I believe there is one question where attorney-client privilege wasn't immediately written or, excuse me, immediately stated during the deposition, I would submit that that's absolutely not a waiver of the attorney-client privilege in that context. One of the problems that I see here, and it came out in Mr. Lauz's argument today, is that many of the things that Mr. Lauz told you simply aren't in the record. They were things that Mr. Lauz told Judge McAuliffe during the hearing with respect to what went on in Mr. Euling's laptop. But there's absolutely no evidence of that in the record besides Mr. Lauz's commentary about it during the hearing, and that is in the excerpts of record that we've presented. You can see the same arguments that Mr. Lauz gave today, or, excuse me, really the same testimony that Mr. Lauz gave today he gave to Judge McAuliffe. However, when you look at this record, and this is why there is clear error and why mandamus is appropriate here, there's simply no evidence of a crime that the district court or the magistrate could have reasonably inferred occurred in order to breach the privilege. Even if there is no evidence of a crime, mandamus could still be inappropriate, no? Yes, Your Honor. That's true. It could be clear error doesn't mean that you always get an extraordinary writ. That's absolutely true, and I can't claim otherwise. I do believe that the entirety of the circumstances of this case and the fact that we are here arguing it today make mandamus absolutely the appropriate remedy in front of this Court. I simply want to all finish. I know I have 20 seconds, unless the Court has other questions. I believe that Mr. Lauz's statements really emphasized why contempt and subsequent proceedings aren't an adequate remedy. In addition to all the reasons that I've given the Court, there's also the fact that Mr. Euling is a third-party witness in a different jurisdiction, and this Court should not be – overlook the basic cost issues involved here. And that's a fairness issue that overarches any – many of the cases cited in our brief, and it goes to mandamus and the extraordinary remedy available to Mr. Euling. And with that, unless there are further questions, I realize I am out of time. Thank you, counsel. The case just argued will be submitted for decision.
judges: Adelman, O'scannlain, Murguia